The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Raylene D. Grisho presiding. Good morning, Counselors. This is case number 4241394, Duane Loy versus Kenneth Loy. Would Counsel for the Appellant please state your name for the record? Yes, good morning, Your Honor. I'm Bob Seltzer representing Ken and Julie Loy. Thank you. And would Counsel for the Appellate please state your name for the record? Yes, thank you, Your Honor. Philip Spiker, Counsel for Duane Loy, Darren Loy, Donna Loy, and Chris Shields. Thank you. It's my understanding both attorneys are aware of the time constraints in light of the cross appeals. Am I correct? We are indeed. Thank you. Okay. With that then, Counsel, you may proceed. All right. Thank you, Your Honor. May it please the Court. As the Court is aware, this case has gone on for over a decade and involved analysis of claims relating to a general partnership as well as several business entities. Given the accountings that are at the heart of this case, the lower court was required to examine dozens of transactions in order to establish each partner's capital account and the amounts due and owing between them. With the parties' stipulation, the lower court appointed a well-credentialed forensic accountant to assist it with this process. As the record reflects, the lower court's ruling essentially split the claims and the monetary award exactly in half. Both parties have appealed the judgment in this case. I am mindful of the standard of review applicable to the rulings of the lower court, which is why I have briefed four points on appeal for your consideration and have likewise responded to the cross appeal filed by Mr. Duane Loy. My first point on appeal concerns an award of $437,000 for rent and interest on certain grain bins utilized by my clients pursuant to an interim agreement between the parties. We assert that the De Novo, the award that was made was several weeks before the trial began, and it was not based on any claim or account in the complaint. The lower court found that there was an interim agreement between the two partners, which began immediately once the partnership was dissolved. Both parties asserted in their pleadings that there was a year-to-year tenancy agreed upon, and as part of the deal, each side was given a portion of the land and whatever fixtures were on it. Part of the deal also was that Mr. Duane Loy was given the use of all of the partnership's farming equipment for as long as the interim agreement was in place. There was no evidence and there was no finding by the lower court that there was any sort of carve out or reservation related to the grain bins. In fact, when the motion was filed, as the record reflects, on behalf of Mr. Duane Loy, the statement was made to the court that they had not anticipated that there would not be a final agreement by the time 2017 rolled around. The grain bins were fixtures on the land, and of course, we all learned in first-year property that fixtures run with the land unless there's an agreement. There was, as you saw in the record, there was testimony initially elicited of Mr. Duane Loy to the effect that they had somehow held that back, but on cross-examination, as you'll see, he took that back. He disavowed that that was the case. But despite that, Mr. Duane Loy's argued to the trial court that it was simply unfair for Ken Loy to have the use of these grain bins during the two-year period in question, and he asserted, based on equity, that he was entitled to the value or half the value of that rent. We argued rather strenuously that the tenancy was agreed upon and the use of grain bins went with the land that was given to Ken Loy, just as the use of sheds and other facilities was given to Duane Loy for his half of the land. But as you saw during the arguments before the trial court, the court inquired as follows, did the brothers take into account how much storage they were getting with this division? The problem we have with that is the trial court had all the authority in the world to enforce an agreement between these two brothers, but the court had no authority to go behind the agreement and question whether, in hindsight, it was a fair agreement or otherwise well-reasoned between the parties. They made their deal. The court found that it was a year-to-year tenancy, and as a matter of law, that should have been the end of the inquiry. One of the other things that we all learned in law school is that equitable relief is only available if there is not a legal remedy. And I've cited to this court authority for the proposition that where there is a comprehensive agreement between the parties, there is no room for equity to intercede in this case. And again, the civil rules require that claims like this be part of an account in the complaint. They amended their complaint, but despite this issue floating out there for years and years, they still never brought a claim in their complaint for this. We argued, of course, that the court split this case down the middle, but the reality is, with this award, which was ordered before the trial even began, Dwayne Loy is far ahead of his brother in terms of the monetary relief that he received from the lower court. The second issue that I briefed for you and would ask you to consider involves the mid-trial amendment of the pleadings on behalf of Darren Loy and Chris Shields. Darren Loy is the son of Dwayne Loy, and Chris Shields is the son-in-law of Dwayne Loy. The record will reflect that those two individuals had their own farmland separate from the partnership land, and that they received the benefit of various inputs and resources that were paid for by the partnership. They received fertilizer and inputs, and they received the benefit of labor that was provided by employees of the partnership. We filed a complaint that included claims against these two individuals back in 2017. Their counsel, on their behalf at that time, filed nothing more than a general denial. There was no affirmative defense. There was no counterclaim asserted, anything like that. The court, as we got close to the trial date, ordered the parties to submit a joint listing of all of the damages and all of the claims that they had and to quantify them monetarily. So we did that, both of us, on the eve of trial. Nowhere, anywhere in Dwayne Loy's submission or the submission on behalf of Mr. Shields or Darren Loy was there any hint of any kind of offset. But yet, on the fifth day of trial, counsel for these individuals attempted to put on evidence of a so-called barter agreement, where they had allegedly agreed that they would barter or trade their labor in return for receiving these benefits from the partnership. I immediately objected to this strenuously. As you'll see, the court even, the trial court even asked counsel, why is it we're just getting this claim on the fifth day of trial in a case that's been pending for six years? And you saw that counsel said we didn't really have a good excuse for that or words to that effect. I also, on the fly, raised the statute of limitations defense to that. Had I seen this in an actual pleading, I would have filed a response. I would have filed an affirmative defense and alleged that this violated the five-year statute of limitations that would be applicable to this bartering claim. I argued this in court. The court, in its ultimate treatment of this claim, allowed the offset, allowed the pleadings essentially to be amended to allow for this. And the evidence we put on was fairly overwhelming. Chris Shields admitted on cross-examination unconditionally that he owed $144,000 back to the partnership. When we put on our expert witness, Bethany Hearn, forensic accountant in her own right, she said that Ken Loy was owed $175,000 by Mr. Shields and $88,000 by Darren Loy. That was not rebutted in any way. The only response was this late middle of trial attempt to amend the pleadings. I understand. I've been a lawyer for 40 years. I've argued a number of appellate cases. I know very well how difficult it is to make an abusive discretion argument. But as I said in my briefing, and I really believe this, if this is not an abusive discretion, then I just don't know what is. And separate and apart from that, the statute of limitations defense is very clear. This so-called barter agreement that's been asserted here would have involved labor and work that was done in 2013, 14, and 2015. So had this claim been filed at any time prior to 2020, it would have been timely, but it was not. It was filed in 2023. And therefore, it was three years past the limitation period. And there's also... Yes, Your Honor. And then no amended pleading was ever filed regarding this barter agreement, correct? It was not. This claim was purely verbal, made on the record in the middle of a trial. And what about then, didn't counsel assert that this had been brought up in depositions, I don't know, a couple of years earlier, sometime? Yes, Your Honor. There was a statement on the record that it had been touched upon in a deposition. And in fact, on a cross examination of John Loy, who's my client's son, he even said there had been discussion and contemplation of some sort of arrangement like this, but that's as far as it went. And counsel never put into the record or before the trial court any further evidence other than that vague summary of the issue being touched upon earlier. And I can tell you that had an actual claim been filed in the pleadings, as I said to the trial court on the record, I would have conducted further discovery. I would have asked them, all right, you're saying there was a barter agreement. What exactly did you do for the benefit of the partnership? What records do you have that you put this time in? What use of your equipment was made? And if their arguments or their claim damages were too grandiose, I would have hired an expert to give commentary on this. But that never happened. They never amended their pleadings. They also argue to this court and to court before that somehow they were entitled to relation back to their pleadings. But the argument they make is not that their own pleadings should relate back, because after all, they didn't file a counterclaim and they didn't file any affirmative defenses, but they say that their pleading should relate back to Duane Loy's answer. Well, Duane Loy's answer makes no reference to any sort of agreement or set off. And Duane Loy is not these parties. He's a completely different individual. Mr. Seltzer, just on this point alone, if we were to agree with you, what would the remedy be as to Darren and Shields? Yes, sir. The remedy would be based on the undisputed evidence. But for this defense, Mr. Shields would owe $175,000 back to Ken Loy as his half. And Darren Loy would owe $88,000 to Ken Loy as his half, given that Ken Loy would be entitled to half of whatever was owed to the general partnership. Thank you. Yes, sir. The third point that we brief for you involves missing grain. We allege quite clearly from the very beginning that nearly a million dollars of grain that belonged to the partnership was missing and that it had been sold off. And we subpoenaed numerous outside parties and we traced the grain sales beginning at the grain elevators and the checks that were then written by the grain elevators. And the undisputed evidence that we put before the judicial accountant was that Duane Loy had signed over a number of checks to third parties. And in doing so, there was no record of money flowing through any account. But that money was used, according to our expert witness, Bethany Hearn, to pay over $700,000 in Duane Loy's personal debts. Additional money that was diverted away from these grain sales was placed directly into accounts controlled only by Duane Loy or into a partnership involving his wife. The total amount of these sales was almost a million dollars. And when I cross-examined Mr. Brangenberg, who was the financial expert, the accountant for Duane Loy, he did not dispute that these sales had occurred. He did not dispute that Duane Loy, his client, had the ability to control where this money went. He instead simply argued that the money, without any specificity, that the money was used to pay partnership debts. Well, Bethany Hearn disagreed. And the most important thing here is that the judicial accountant examined this. And in her final report, which the judgment recites as part of the record here, the judicial accountant found that this was a valid claim, that nearly a million dollars had been siphoned off by Duane Loy and applied for his own benefit. I believe my time is up. Time flies when you're having a good time. Thank you. Thank you. I believe you can proceed. Thank you, Your Honor. May it please the court. We're here because Kenneth Loy apparently believes that he is better at evaluating the evidence from a 14-day long trial and making credibility determinations than a highly experienced veteran judge. Well, you know, there are certainly factual matters that we wish the judge had found more in our favor. It was plainly apparent that all of the trial court's findings of fact were well supported by the evidence. And there's simply no basis for claiming that the court's findings of fact were against the manifest weight of the evidence or that the court abused its discretion in any manner. As a practical matter, we were prepared to accept the lower court's entire judgment. But since we're here, we do believe it's appropriate for this court to exercise its de novo review of two of the lower court's conclusions of law or in the instance of the statutory partnership interest question, the absence of any conclusion of law. So briefly, I'd like to address the standards of review, of course, with respect to the questions of fact that are raised by our opposing counsel. The standard is against the manifest weight of the evidence. The Illinois Supreme Court has held that findings of fact and credibility determinations by the circuit court are according to great deference because the circuit court is in a superior position to determine credibility of witnesses and resolve conflicts and testimony. And essentially, the manifest weight of the evidence standard is equivalent to the federal standard of clear error. And there is certainly no clear error in the court's factual determinations in this case. Of course, with respect to the court's allowance to amend the pleadings to allow the counterclaim for set off, that is subject to an abuse of discretion. And in that case, the question is not whether the court of appeals agrees with the decision, but whether the judge acted arbitrarily without conscientious judgment or exceeded the bounds of reason. I'd like to address real quick your question about the amended, whether or not an amended pleading was ever filed with respect to the claims for set off. Well, first, actually, I'd like to state that opposing counsel states that we never raised this in our list of claims, but the court record shows that we clearly identified it as one of our defenses in the list of claims that was submitted immediately prior to trial. It's in page 2756 of the common law record. In count five, we specifically state Kenneth's claim is denied because of set offs due Chris, Darren, and Dwayne for their labor and for set offs for personal advances for equipment taken by Kenneth. So we specifically raised that in addition to the fact that it was brought up in depositions that has been Chris and Darren's defense the entire time. And we just didn't discover until trial that prior counsel had never formally pled it. With respect to the question of whether or not amended, if I could interrupt, what's the page number again? Yes. 2756 of the common law record. Okay. And what is that referencing? That's referencing there. There's a discussion of Kenneth's claims and Dwayne's claims. And there is a claim for Kenneth of $232,000, which I believe is roughly the amount that Mr. Seltzer referenced. And we state that that amount should be zero in our list of claims because of the set offs that Chris and Darren are entitled to. And just to clarify, we did file a motion for leave during trial. We orally moved and filed a written motion for leave. The court never officially ruled on that written motion. He simply allowed the claim within his judgment. We certainly would have filed the actual amended pleading if authorized to do so, or if that motion had been officially granted. But also with respect to the statute of limitations issue, we did have a misstatement in our brief. We stated that it relates back to Dwayne's answer, but that was just a clerical error. What we meant to state is that it relates back to Chris and Darren's answer, which was filed in 2018. So Kenneth Lloyd filed an amended pleading claiming these amounts against Chris and Darren, and they filed the timely answer to that claim in January of 2018. Of course, if the counterclaim had been pled at that point, it would have been pled on that pleading. And so when the court granted the then the amendment relates back to Chris and Darren's original pleading, which is the answer that they filed in 2018, that's certainly within the five year statute of limitations that it could have been made. And so therefore that claim is timely. So counsel, are you saying that Darren and Mr. Shields are part of this appeal? Yes, they are. They're parties to the case. They are responding. They were parties with Dwayne, and the court made rulings with respect to claims that were made against them. And we have been representing them as part of this matter this whole time. And I think one other thing I would like to address, and we've referred to in our pleadings all in the lump, lumped in as Dwayne, because Dwayne was the lead plaintiff in the case. To be clear though, counsel, are you representing here during argument that you represent Darren and Shields? Yes, yes, we do represent Chris and Darren. We are representing them in this appeal in addition to Dwayne. Yes. One of the things that I think is important to is that with respect to this set off issue, first of all, the court did not abuse its discretion in allowing an amendment that is clearly permitted by the statute. The statute states that an amendment can be pled at any time before or after judgment. It's well established in case law that this statute section 616 is to be liberally construed to allow cases to be decided on the should be applied and allowing amendments. Here the court was sitting in equity and the court properly recognized that the only equitable outcome with respect to this issue was to give every party credit for the benefits that they provided to the other party. The general operation here was that all of the members of the family contributed to the operation. Darren and Chris provided a substantial amount of labor. Darren worked practically full-time for years for the partnership without getting paid. In exchange, he was able to use some of the equipment of the partnership for free. When Dwayne and Kenneth began fighting and began litigation, suddenly Kenneth decided that he should be paid back for all of the free equipment usage that Chris and Darren received. The court concluded, rightly, that each party should get credit for the benefit that they provided. Chris and Darren provided free labor. They should get credit for that. Kenneth provided, you know, the partnership provided equipment for them to use for free and those things should be netted together. That's the the result that the court found and that is that's the equitable conclusion. It's the only equitable conclusion and it was not going to be so discretion for the court to allow that amendment and award that. With respect to the grain rent, the party's the when when the, I'm sorry, when the sole question there is whether or not the party's agreement regarding the usage of the land included this multi-million dollar jointly owned grain elevator that they had built at one of the farms. When Dwayne withdrew from the partnership at the end of 2015, the 2016 planning season was coming quickly and they had to decide who was going to farm the various portions of the land. So they agreed how the farmland would be split up and they essentially agreed that the land would closest to their respective residences would be that they would each farm the land closest to their respective residence. They never discussed usage of this multi-million dollar grain elevator. The grain elevator is not simply just a shed on one of the farms. It is an enormous jointly owned elevator that they used for their entire operation related to all of the farms, thousands of acres prior to their split up. And so the question here was whether or not Dwayne agreed that Ken automatically got the grain elevator in addition to the land that he would be farming. The facts clearly showed that there was never any discussion about the grain elevator. Kenneth appears to believe that it should have just automatically been included even though it was not discussed. But the real facts are that the question is what was actually the terms and scope of the agreement that they reached and the facts clearly show that the terms and scope were strictly limited or only included a split of the farmland. It did not include this elevator. I think it's also relevant to point out that Kenneth didn't just start using the elevator. He started renting the elevator out to other neighboring farmers and he kept all of that money. The elevator was jointly owned 50-50 between the two of them and Kenneth just took it over, rented it out, and kept all of the money. And the court rightly concluded again in a court sitting in equity that Dwayne should be compensated for his loss of use of that facility for those couple of years. The entire time Dwayne was trying to obtain it back as soon as they, when they agreed on the split of the land, Ken immediately started putting grain in there and taking it over. And Dwayne right away throughout the entirety of the proceedings did his best to try to get it back and he was denied possession of it. But at that time the court specifically stated there are other ways that we can compensate Dwayne for his loss of use of the facility and this is the way that the court found to compensate him. With respect to it being required to be part of a separate count in the proceedings, again case law is clear that pleading should be liberally construed to decide cases on the merits. This entire case is related to their entire joint farming operation which included the usage of the facility when they were farming together. The counts in the case were primarily an accounting of the entire partnership and an accounting of their joint assets and a split up of their joint assets which included this. There's no reason why usage of their elevator facility for a two-year period should somehow be a separate count, separate from the disentangling of all the rest of their assets. Also with respect to the alleged missing grain issue, I'd like to address a couple of things. First of all, opposing counsel I think conflates two different areas. There was one respect where Dwayne, when Kenneth shut down the partnership's bank account, Dwayne no longer had anywhere to put money for the sale of grain. So he opened a new partnership account, he did sell grain, and he put that money in that partnership account. All of that money is already incorporated into this judgment. He did not steal that money and he put that money in a partnership account that was then accounted for and split up by the court and the judicial accountant in here. Kenneth's claim with respect to this phantom missing grain is they're claiming that there's an entirely additional million dollars worth of grain that nobody knows where it went and he claims that Dwayne stole it and sold it. However, the facts showed that that grain never existed. Ken made it all up. There was never any missing grain. His entire case was based on a purported FSA count that had all sorts of problems with it. Our expert witness was a former grain facility auditor and he pointed out numerous areas where that FSA count was clearly just not credible. Kenneth's entire claim regarding this alleged missing grain was based on this FSA count house of cards. The court concluded that the FSA count was not credible and therefore the facts just showed that there was no missing grain and that is supported not only by the manifest weight of the evidence but the overwhelming weight of the evidence. Also, opposing counsel claims that somehow the judicial accountant was able to determine with finality that somehow this phantom grain existed and went missing before ever having had the benefit of 14 days worth of trial evidence and what I'd like to highlight here is that the judicial accountant certainly did not make that finding. Her task was to prepare a very complicated spreadsheet to determine the value of everybody's interest, of each party's interest, following the court's findings of fact. There were obviously a number of disputed issues and she had to create places in that spreadsheet to account for the possibility that the court would find one way or the other. So, one of those things she did was she created a place in her spreadsheet for the disputed claim regarding this alleged missing grain. Her report where she placed that in there specifically states, I assumed that there was uncounted grain. Her assumption was solely for purposes of that report. Clearly, she was not defining her fact. The order that appointed her specifically stated she's not defining a fact and I don't think that any reasonable person would say that any person could have reached that finding of fact without the benefit of the evidence from a 14-day long trial. Therefore, her assumption is not a finding. Her assumption is not evidence and for all we know, the court and her and the judicial accountant had a substantial amount of contact between the two of them prior to and presumably after the trial. For all we know, she was convinced after the trial that none of that grain existed either. That is one of the reasons why we give the trial court deference. The trial court was the finder of fact. The trial court concluded that Kenneth's claim regarding this missing grain was clearly not supported by the weight of the evidence and the court's determination was not against the manifest weight of the evidence. I'd like to turn just quickly to a couple of our two issues that are subject to the noble review. First of all, with respect to the predecessor partnership claims, this case started with Dwayne's claims regarding the successor partnership and during that time, we discovered that there was the same misconduct that we alleged against Kenneth in the successor partnership was occurring in the predecessor partnership and so we filed a motion to extend those claims back to the years 2000 through 2012 with respect to the predecessor partnership and the court that that was a motion that opposing counsel moved to dismiss. The court evaluated all of this and concluded at the time that that all of the requirements for relations back were met. The amendment was granted. The court concluded that this arose out of the same transactions and occurrences that caused it to relate back to the prior complaint and therefore the amended complaint with respect to or the amended claims with respect to the same conduct and the predecessor partnership were timely. With respect to the same transaction occurrence question, I mean these were the same part, the same business, farming the same land under the same name, using the same equipment, everything about the predecessor partnership and the successor partnership for purposes of the transactions and occurrences evaluation was the same. The only difference was that in 2013, they agreed to change their split of the profits and change a few of the things about how they split things and that is certainly not enough to make this not part of the same transactions or occurrences and so therefore and frankly we think that to a certain extent the court's prior ruling that this was the same transactions or occurrences is somewhat akin to the law of the case. I mean the court evaluated all the same facts and reached that conclusion but then later on in this judgment basically just reversed course, did a 180 and said and determined that now it was not the same transactions or occurrences and we believe that the court correctly ruled on it the first time and that it was the same transactions or occurrences. Finally just with respect. I don't want to interrupt you there counselor. So with the prior partnership, the compensation and every distribution of income was wasn't it 75-25? Correct. With the new partnership, everything was 50-50, correct? Yes, that's the primary change was the change. Kenneth wanted to go to 50-50 and he offered to pay Dwayne half of the difference in the value of Dwayne's equipment. Dwayne had the majority of the equipment prior to that. Kenneth agreed to essentially buy half of Dwayne's equipment in exchange for Dwayne's agreement to switch from 75-25 to 50-50 but again it's the same exact farming activity, same individuals, same land, same equipment, everything else was the same and we believe that and it was the same misconduct by Kenneth and we believe that it's the same transactions or occurrences. The change from 75 to 55 certainly does not change that or cause it to somehow no longer be the same transactions or occurrences. But what about the partnership agreement that specifically says this is the sole agreement relating to the parties and their partnership for the newer partnership? It specifically says that so it is different, would you agree? Well, it was a change in their partnership split and that was the sole agreement with respect to the change and how they would be splitting the income and expenses. However, they seamlessly transitioned from one partnership to the successor partnership which was the same in all respects except for their split of the profits and so therefore we don't think that that is nearly sufficient to state that it's not the same transaction or occurrence. But I know you're out of time but I have one more question. What about notice to Ken about this claim? That's part of this relation back. How was Ken put on notice that you were going to claim stuff all the way back to 2000? Oh yeah, he had plenty of notice. First of all, as soon as we discovered that he had concealed all of this misconduct with respect to the predecessor partnership, we filed a motion to make these new claims but one of the fact that Kenneth concealed all this misconduct for so many years, it wasn't discovered until Dwayne had made his claims with respect to the successor partnership and then all the evidence started uncovering this misconduct from the prior years and so we asked the court to allow us to extend back to the year 2000. The court agreed that it was the same transactions or occurrences Kenneth had all the time in the world at that point to defend the issues and it was a surprise. He had plenty of time to prepare and defend against those issues and he did a trial. Okay, thank you. Thank you. Mr. Seltzer? Yes, your honor. Thank you very much. First of all, there was no misconduct and you don't have to take my word for it. The judicial accountant did a year-long in-depth audit and found that all of the tax reporting was honest and complete. The lower court, after a trial on the merits, found that there was no fraud. All right, so end of story for that issue. It seems to me also and separately the court found there was no prior partnership. It was a completely different arrangement so there was no relation back. On the missing grain issue, counsel is arguing to you that this was phantom grain, that it didn't exist and I almost don't know what to say to that except that his own expert, Mr. Brangenberg, said that the judicial accountant had in fact found that this grain was missing and had been sold and had been applied for the sole benefit of Duane Loy. Mr. Brangenberg did not dispute that this grain existed or that it was sold or that Duane had the ability to apply it. And the point that I didn't reach during my initial argument was this. The trial court didn't consider this. Counsel's arguing that this was somehow a credibility determination but I'm sorry, with respect, that is a straw man argument. The court specifically held in the judgment that entered a year after the trial was over that there was no evidence supporting this claim, no evidence at all. And I cited you to the INDEC energy services case for the proposition that this was not part of the evidence that was considered by the court, thus calling into question the manifest weight standard. Counsel, I'm sorry to interrupt you again. No, you go right ahead. You say there's proof of no fraud in the record and I know that the briefs mentioned Volker's letter from March 13th of 23. We could not find that anywhere in the record. Do you have that or can you point us to that letter in the record because we could not find it anywhere? So the court made it clear that Ms. Volker's various reports were part of the record but for some reason the clerk did not include any of those reports when the record was transmitted to you. We asked counsel to agree that the final report would become part of the record. He did agree to that. When we then asked that the earlier reports be added, he would not agree and we were in the heat of our briefing on that and therefore we did not pursue it. But in the judgment itself, the court says that no fraud was found and that there was no culpability. So to me that's the ultimate litmus test here. But he was in fact, as the record reflects, relying upon the informed investigation of his judicial accountant. But you know, I'm going to anticipate a question and that is, was the lower court bound by the findings of his assistant, his judicial accountant? And the answer is no. But he didn't even consider it by his own statement. Now had he considered it and rejected it, I think we'd all be sitting here scratching our heads, but it would be a very different situation under the circumstances. Regarding the green bins, you heard counsel make the statement that there was no discussion about the green elevators. Well it seems to me that that underscores my position in this case. If they made a comprehensive deal to apportion the land and all the fixtures on it, then that's the end of the inquiry. It was a year-to-year arrangement. There's no statute of frauds here. Both sides have pleaded affirmatively that there was a year-to-year tenancy here. You saw in my briefing that there was actually a notice at one point sent by Mr. Spiker's predecessor where he said we are terminating this tenancy including the improvements and that sort of thing. And in their briefing, they argued that that was somehow a boilerplate from a form and it should be disregarded. Well hopefully that argument was not well received by the court under the circumstances. The final point, well let me address quickly the cross-appeal. Again, the court found that we won on the merits. So we can argue all day long whether the statute of limitations applied, which it did according to the court after it had actually seen the evidence and heard the Duane Loy, but we won on the merits. The claim for interest under the Illinois Uniform Partnership Act, they did once again, they did not even seek interest in their pleadings. They did not. There's no claim that alone was made. The other thing that I wanted to comment on, counsel argued that my client got these grain bins and leased them out. This is a massive record. I think there's over 4,000 pages of transcript. It was a three-week trial, thousands of pages of exhibits. But I will tell you, I think I have at least an average memory and I have no memory whatsoever of this. So if there's a citation in the record, then that's fine. I'm not sure it matters though. If this fixture was ours for a two-year period by agreement, then my client was entitled to do with it what he wanted. The final point that we argued was that the trial court gave credit to Duane Loy for contributions to the partnership that he was not entitled to. So both sides had evaluation experts to put a value on the equipment. We had a stipulation that we reached in 2018. We agreed exactly piece by piece what Duane Loy was getting at the end of the partnership, but we were not in agreement as to what had been contributed at the beginning of the partnership. But what the stipulation made clear was that Duane Loy was not to be given credit for a available on the first day of the partnership, which was January 1st of 2013. There were two very expensive, very valuable pieces of equipment, a fertilizer spreader and a tractor, that the court put back into the record and gave as a credit amounting to over $300,000 to Duane Loy. Duane's expert didn't even list that, didn't even claim it. The valuations were put in place by the valuation experts, but the inventory, construction of the inventory was very much a matter of documentary evidence provided by the accountants in this case. So one of the record that we put before you shows that it was replaced by another piece of equipment that Duane did in fact legitimately contribute to the partnership, but he ended up getting double credit. He was given credit for the piece that had been traded away and he was given credit then also for the piece that was acquired. The other item was purchased with partnership assets after the partnership began. There were a number of smaller items. I realize that this is difficult and intricate analysis, but we've bent over backwards to try to direct you to the record to show that with respect to some of the items that were claimed by Mr. Duane Loy, they were not appropriately counted in his favor. So for example, there was a F-450 pickup and a Red Dodge pickup. They were valued at $45,000 and $38,000. They were not part of the assets that were contributed at the time the partnership began. Finally, we have a category that we entitled mismatch items. What that really means is there were several items of equipment that Duane Loy without question contributed to this partnership. He was entitled to credit, but on the back end, when he walked away from the partnership, he was not debited for taking the equipment with him. And so notably in this category is a backhoe worth just under $50,000 and a drill worth $70,000. I see I have 31 but there were grievous errors made by the trial court as we have tried very hard to show to you. Collectively, these errors translate to approximately $1.5 million for Ken Loy. And we ask that you examine them. They are mistakes of law and they are mistakes. They are abuses of discretion. We ask that you reverse the judgment of the lower court. Thank you very much. Can I just ask you one quick thing for when you said he was debited, you said the backhoe and then did you say that the drill? Yes, ma'am. I did. Okay. Just want to make sure I got that correctly. Thank you. Right. All right, Mr. Slacker. Thank you, Your Honor. Yeah, I will try to go quick. So with respect to our allegations of Kenneth's misconduct, the judicial accountants certainly did not find that there was no misconduct or no fraud. That is Kenneth's self-serving interpretation of some of her statements in her report. All of the citations in their brief to this claim of no fraud are Kenneth's own testimony interpreting the judicial accountants report. There was one statement in her report where she said that there were no unequivocal tax benefits that Kenneth received. And that's because Kenneth didn't report as income all of the money that he from the predecessor partnership. He withdrew a million dollars more than his share of the income but he didn't report it as income. And so he did not receive any unequivocal tax benefits, but he did take it. And that's clearly supported in the record. The judicial accountant had those calculations. Craig Brangenberg did not agree that she made that finding either. Our expert, he was asked the question if he saw that assumption in her report and he agreed that he saw that assumption in her report. He clearly did not agree that there was any missing grain. And he demonstrated that by the evidence with respect to their claim that the court found that there was no evidence of this alleged missing grain. That's a specific reference to an admission that Kenneth made on the stand where he stated that he made a complete forensic investigation of all of the accounting records, all of the grain sales. And he attempted to find, he believed that Duane had sold a bunch of grain in other people's names and he attempted to find where. And he was asked, do you have any evidence of any sales of uncounted grain in other people's names? He admitted that he didn't. And that was exactly the court's reference to no evidence. Kenneth admitted he had no evidence of any uncounted grain sales by Duane in other people's names. The facts show that this evidence didn't exist. With respect to Kenneth's renting out of the grain bins, the reference in the record is, it's the reported proceedings, pages 112 to 113 and page 118. It's part of Duane's testimony in a prior hearing where he indicated that Kenneth had been, Kenneth began renting out the Carter grain bins and kept all the money for himself. Opposing counsel makes a statement that says they agreed to a split of the land. This is with respect to the land split, that they agreed to a split of the land and all the fixtures. That's where the problem is. They did not agree to any of the fixtures and much less this multi-million dollar facility where in the record, there are multiple pieces of evidence where Kenneth himself agreed that that multi-million dollar grain elevator is an entirely separate asset. At one point in trial, he claimed that he was the 100% owner of that facility even though it was built on ground that they owned 50-50. Also, later on after this agreement to the split of the farmland fell apart, all of the farm ground and the rental of the farm ground was auctioned off. The land was auctioned and also the grain facility was auctioned. It was auctioned off separately and different people won the bid to rent the ground versus the facility. The facility was never incorporated into this agreement for the farmland. With respect to the equipment, just real quickly, I'll state that the evidence certainly supported every single item. Most of the evidence demonstrating that the partnership owned this equipment and therefore Duane contributed it was Kenneth's own tax returns where he reported that equipment as partnership assets. He got the benefit of 50% of the depreciation of those assets. It would certainly be inequitable to say that he should have gotten the benefit of the 50% of the depreciation for those assets for three years but then denied Duane the credit of ever having contributed it in the first place and claimed that it was never owned by the partnership in the first place. That decision was clearly supported by the evidence. Finally, quickly, I just want to address the statutory partnership interest. We would state that the Uniform Partnership Act states that a partnership shall reimburse a partner for contributions beyond what agreed to contribute. It's an automatic right of reimbursement and it states that that is a de facto loan which accrues interest. There's no discretionary component to it. It is mandatory. Here, the court, frankly, we believe the court just overlooked it. We addressed it in our trial brief but the court never stated one word about it even though it is a mandatory right. We would argue that Duane contributed it. He contributed more than he intended to contribute and he should be paid interest for the partnership's use of that excess contribution during those three years. Thank you. Thank you, counselors. The court will take this matter under advisement and the court now stands in recess. Thanks.